UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LAZARUS ADSIDE,
      Plaintiff,

vs.                              Case No.: 3:20cv5571/LAC/EMT

LIEUTENANT STOKES,
      Defendant.
_____/

## **REPORT AND RECOMMENDATION**

Plaintiff Lazarus Adside (Adside) is proceeding pro se and in forma pauperis in this civil rights case filed under 42 U.S.C. § 1983. He was an inmate of the Florida Department of Corrections when he commenced this case on June 14, 2020 (*see* ECF No. 1), but he was released five months later (*see* ECF No. 12). Presently before the court is Adside's Amended Complaint (ECF No. 18).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)–(C); Fed. R. Civ. P. 72(b). After careful consideration of the issues presented by Adside, it is the opinion of the undersigned that his claims should be dismissed, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1).

## I.    BACKGROUND

Adside names Lieutenant Stokes as the sole Defendant in his Amended Complaint (ECF No. 18 at 1, 2). [1]  Adside claims that Lieutenant Stokes' ordering his subordinates to spray Adside with a chemical agent constituted excessive force in violation of the Eighth Amendment (*id.* at 5–8, 10).  Adside also claims that Stokes' depriving him of one dinner meal, placing him on property restriction for 72 hours, and placing him on special management meal for seven days violated the Eighth Amendment.  Adside additionally claims that the property restriction deprived him of access to his religious prayer rug for 72 hours, and his placement on special management meal deprived him of his kosher meal for seven days, in violation of his First Amendment right to freely exercise his religion (*id.* at 10).  Last, Adside brings a Fourth Amendment claim with respect to the 72-hour property restriction (*id.*).  Adside seeks compensatory and punitive damages for physical injury, pain and suffering, humiliation, embarrassment, mental and emotional injury, and mental and emotional distress (*id.* at 9).

---

[1] The court refers to the page numbers automatically assigned by the court's electronic filing system.

Case No.:  3:20cv5571/LAC/EMT

## II.    STATUTORY SCREENING STANDARD

Because Adside is proceeding in forma pauperis and was a prisoner when he commenced this case, federal statutes require the court to dismiss this case if the court determines that his allegations fail to state a claim upon which relief may be granted.  *See* 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1).  The statutory language "tracks the language of Federal Rule of Civil Procedure 12(b)(6)"; therefore, dismissals for failure to state a claim are governed by the same standard as Rule 12(b)(6).  *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997).  The allegations of the complaint are taken as true and construed in the light most favorable to the plaintiff.  *See Davis v. Monroe Cnty. Bd. of Educ.*, 120 F.3d 1390, 1393 (11th Cir. 1997).

To survive dismissal at the screening phase, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  The plausibility standard is met only where the facts alleged enable "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Plausibility means "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quotation marks and citation omitted).

The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quotation marks and citation omitted). And "bare assertions" that "amount to nothing more than a formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." *Id.* at 681 (quotation marks and citation omitted). Stated succinctly:

> Pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679.

III.   ADSIDE'S FACTUAL ALLEGATIONS

The court includes factual allegations from Adside's Amended Complaint (ECF No. 18) and any clarifying facts included in his initial Complaint (ECF No. 1). Adside alleges that on December 26, 2019, at approximately 1:20 p.m., he was sleeping on his bunk in the cell he shared with another inmate (*see* ECF No. 1 at 5). Lieutenant Stokes stopped at the cell, kicked the door, and directed Adside's cell mate to "Get that mother fucker up and get this cell cleaned up." (*id.*). Adside alleges

as he emerged from his bunk, Lieutenant Stokes directed him to give him the homemade white cap Adside was wearing (*id.*). Adside alleges Stokes opened the flap of the cell door to retrieve the cap (*id.*). Adside alleges as he brought the cap to the door, he asked Lieutenant Stokes, "What did I do to you to cause you to disrespect me and call me out my name [sic]? If we as inmates are not allowed to disrespect your officers, what gives you the right to disrespect me?" (*id.*). Adside alleges Lieutenant Stokes responded, "Because you put yourself in this position." (*id.*). Adside responded, "I never put myself in this position to be disrespected." (*id.*). Lieutenant Stokes stated, "Then do something about it." (*id.*). Adside responded, "I don't have to do anything. I go home next year. Now you do something about it mother fucker." (*id.* at 5–6).[2] Lieutenant Stokes stated, "Oh I will. You're going on property restriction for destruction of state property." (*id.* at 6). Adside alleges he told Lieutenant Stokes that he made the cap from a "long john thermal shirt" that the FDOC did not provide (*id.*). Lieutenant Stokes responded, "You can't prove it." (*id.*).[3]

Adside alleges two officers came to his cell and "attempted" to carry out Lieutenant Stokes' order to place Adside on property restriction (ECF No. 18 at 5;

---

[2] Disrespect to officials is a violation of the FDOC Rules of Prohibited Conduct. *See* Fla. Admin. Code r. 33-601-314 § 1-4.

[3] Destruction of state property is a violation of the Rules of Prohibited Conduct. *See* Fla. Admin. Code r. 33-601.314, § 7-1.

*see also* ECF No. 1 at 6). Adside states he told the officers that the property restriction was unjustified, and the officers left (*id.*). Adside alleges Lieutenant Stokes returned to his cell with a handheld camera "in an attempt to intimidate plaintiff into complying" (ECF No. 18 at 5; *see also* ECF No. 1 at 6).[4] Adside alleges he inquired as to the reason he was being placed on property restriction, and Lieutenant Stokes directed a subordinate to discharge a large can of chemical agent into the cell (ECF No. 18 at 6; ECF No. 1 at 6). Adside alleges he was placed on property restriction, including relinquishing all of his clothing except his boxer shorts, and taken to a shower for decontamination (ECF No. 1 at 6; ECF No. 18 at 6). Adside alleges after he showered, he was escorted to another shower stall in another wing of the dormitory (ECF No. 18 at 6).

Adside alleges he was still in the shower stall at 5:25 p.m. (four hours after the incident began), when the dinner meal was served (ECF No. 18 at 6). He alleges Lieutenant Stokes ordered officers not to serve him dinner (*id.* at 6). Adside alleges he remained in the shower stall until the officers' shift-change two hours later (ECF No. 1 at 7; ECF No. 18 at 6). Adside alleges an officer ordered him to "cuff up" to be escorted to a new cell, but he "refused to submit" (*see* ECF No. 1 at 7). Adside alleges the officer threatened to apply chemical agent, but he (Adside) "did not

---

[4] Disobeying a verbal or written order is a violation of the Rules of Prohibited Conduct. *See* Fla. Admin. Code r. 33-601.314, § 6-1.

automatically respond" (*id.*).  Adside alleges the officer left the area and returned

with a handheld camera, and Adside then complied with the order to submit to

restraints (*id.*).  Adside alleges he was escorted, or as he characterizes it "paraded,"

in his boxer shorts to a cell in the next wing of the dormitory (ECF No. 18 at 6–7).

He alleges he was provided a very thin mat to sit and lie on (*id.* at 7).  Adside

acknowledges he was provided medical treatment for cuts and scrapes on his ankles

from the leg restraints, and that he had access to running water to relieve the burning

sensation from certain areas of his body (*see* ECF No. 1 at 8; ECF No. 18 at 8).

Adside alleges he remained on full property restriction for 72 hours, during which

time he was deprived of all of his property, including his religious prayer rug (ECF

No. 18 at 7).[5]  He alleges that during this 72-hour period, he was unable to sit, lie,

or sleep "without being in some type of pain or discomfort" (ECF No. 1 at 8).

Adside alleges he participated in the Religious Dietary Program (RDP), which

authorized him to receive kosher meals (ECF No. 18 at 6–7).  He alleges Lieutenant

Stokes placed him on special management meal for seven days, thus depriving him

---

[5] Items of clothing, bedding, or property may be removed from an inmate for 72 hours to prevent destruction of property or to prevent the inmate from impeding security staff from accomplishing functions essential to the unit and institutional security.  *See* Fla. Admin. Code r. 33-602.220(5)(q). Staff must reassess the need for continued restriction every 72 hours thereafter.  *See id.*

of his kosher meals during that time (*id.* at 7).[6]    Adside alleges the special management meal caused him to suffer physical discomfort during bowel movements, and he noticed blood in his stool (*id.*).    Adside alleges he also suffered "sever [sic] mental anxiety and discomfort" and "mental pain" because his "mental pact with Allah had been broken and his body/temple was defiled" (*id.*).

Adside alleges Lieutenant Stokes did not actually charge him with a disciplinary infraction for destruction of state property, because Stokes knew he would be unable to substantiate the charge (ECF No. 1 at 9).    Adside alleges the real reason for Stokes' placing him on property restriction was Adside's display of disrespect (i.e., calling Lieutenant Stokes a "mother fucker") (*id.*).    Adside alleges Lieutenant Stokes did, however, charge him with possession of contraband, a violation of Fla. Admin. Code r. 33-601-314 § 3-12, based upon officers' discovering a cup of urine in a common area of the cell he shared with his cell mate (*id.*).    Adside states the disciplinary report (DR) alleged that when Adside was confronted about the contents of the cup, he stated, "I was going to throw it on y'all but decided I did not want to waste my good piss" (*id.*).    Adside alleges he appealed the DR to the Secretary of the FDOC, and it was overturned (*id.*).

---

[6] The special management meal is "a specially prepared meal designed to be utilized as a management tool in order to maintain a clean, safe and healthful environment in confinement areas." Fla. Admin. Code r. 33-602.223(1).

As previously noted, Adside claims that Lieutenant Stokes' ordering the use of chemical agent constituted excessive force in violation of the Eighth Amendment. Adside claims that Stokes' depriving him of one dinner meal, placing him on property restriction for 72 hours, and placing him on special management meal for seven days also violated the Eighth Amendment. Adside claims that Lieutenant Stokes violated his First Amendment rights by depriving him of access to his prayer rug for 72 hours and depriving him of his kosher meals for seven days. Adside also bring a Fourth Amendment claim with respect to the 72-hour property restriction.

## IV.   DISCUSSION

### A.   Adside's Excessive Force Claim

The Eighth Amendment forbids cruel and unusual punishment. *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003). A claim that a prison official unnecessarily used excessive physical force on a prisoner falls within the Cruel and Unusual Punishments Clause. The "core judicial inquiry" for this claim uses the standard set forth in *Whitley v. Albers*, 475 U.S. 312 (1986): "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley*, 475 U.S. at 320–21); *see also Sconiers v. Lockhart*, 946 F.3d 1256, 1265, 1267 (11th Cir. 2020) (noting that the core inquiry is "the

nature of the force—specifically, whether it was nontrivial and was applied maliciously and sadistically to cause harm").

Analysis of an excessive force claim considers: "(1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat 'reasonably perceived by the responsible officials,' . . . (4) 'any efforts made to temper the severity of a forceful response,'" and "(5) [t]he absence of serious injury." *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015). Courts must take into account "the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,'" and defer "to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Kingsley*, 576 U.S. at 397 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

Demonstrating an excessive use of force "requires a prisoner to establish two elements—one subjective and one objective: the official must have both 'acted with a sufficiently culpable state of mind' (the subjective element), and the conduct must have been 'objectively harmful enough to establish a constitutional violation.'" *Sconiers*, 946 F.3d at 1265 (quoting *Hudson*, 503 U.S. at 8). To meet the subjective element, a prisoner must show that the excessive force was "sadistically and maliciously applied for the very purpose of causing harm." *Sconiers*, 946 F.3d at

1265 (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002)); *see also Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010).  The objective component "focuses on whether the official's actions were 'harmful enough,' *Hudson*, 503 U.S. at 8, or 'sufficiently serious,' *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), to violate the Constitution." *Sconiers*, 946 F.3d at 1265.  Nevertheless, "[u]nder the objective component of an Eighth Amendment claim, the force used, not the injury sustained, is what 'ultimately counts.'" *Id.* at 1267 (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010)).

Analysis of excessive force claims must consider that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9); *see also Sconiers*, 946 F.3d at 1265. Furthermore, "routine discomforts" and other *de minimis* uses of physical force do not trigger the Eighth Amendment's prohibition on cruel and unusual punishments. *Hudson*, 503 U.S. at 9–10.

"[I]t is well-established that the use of chemical agents on recalcitrant prisoners is not per se unconstitutional, . . . [but] there are constitutional boundaries to its use." *Thomas v. Bryant*, 614 F.3d 1288, 1310 (11th Cir. 2010) (citations omitted).[7]  Where chemical agents are used unnecessarily, without penological

---

[7] In *Thomas*, the Eleventh Circuit held that the prison's non-spontaneous use-of-force policy was "unnecessary" and "without penological justification" in the plaintiff's particular case, in part

justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement. *See Danley v. Allen*, 540 F.3d 1298, 1311 (11th Cir. 2008) (holding that unnecessary and continued exposure to pepper spray after the initial spraying, due to a failure to properly decontaminate an inmate, may form the basis of an Eighth Amendment claim), *overruled on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010).

Here, Adside's factual allegations do not plausibly suggest that Lieutenant Stokes' use of a chemical agent was unnecessary or without penological justification. Construed liberally and assumed as true, Adside's factual allegations do not plausibly suggest he was complying with officers' orders when Lieutenant Stokes gave the order to apply chemical agent. Instead, Stokes gave the order after Adside refused, not once but twice, to comply with the officers' efforts to place him on property restriction for allegedly destroying state property. Even though Adside insisted (both now and then) that there was no basis for the property restriction because the property he destroyed was not the state's but his own, Adside's remedy was to grieve the issue via the administrative grievance process (or present his defense to the disciplinary team if a disciplinary report was filed, which it was not), not to refuse to comply with officers' orders. The use of chemical spray was a

---

because his mental illness rendered him "unable to understand and comply with the [correctional] officers' orders." *Thomas*, 614 F.3d at 1310–12.

reasonable, good-faith response to Adside's non-compliance. And after the chemical spray was applied, Adside was removed from the contaminated cell, provided a decontamination shower, and taken to a non-contaminated cell with access to water. Adside's factual allegations do not state a plausible excessive force claim. *See Sconiers*, 946 F.3d at 1264 (noting that "correctional officers in a prison setting can use pepper-spray or a takedown to subdue an inmate as long as a valid penological reason supports the use of such force") (citing *Thomas*, 614 F.3d at 1301–11, and *Danley*, 540 F.3d at 1306); *see also, e.g., Moore v. Hunter*, No. 21-11249, 2021 WL 797803, at *3–4 (11th Cir. Mar. 2, 2021) (holding that facts did not demonstrate that defendant officer engaged in more than *de minimis* use of force or that officer acted maliciously and sadistically where use of force was limited to spraying of chemical agents in response to observing prisoner cutting himself, and prisoner was immediately provided decontamination shower and then seen by medical staff).

Because Adside's factual allegations fail to state a plausible excessive force claim under the Eighth Amendment, the claim must be dismissed, pursuant to §§ 1915(e)(2)(B)(ii), 1915A(b)(1).

**B.    Adside's Conditions of Confinement Claim**

Adside asserts an Eighth Amendment conditions-of-confinement claim based upon Lieutenant Stokes' depriving him of one dinner meal, placing him on property restriction for 72 hours, and placing him on special management meal for seven days.

The "cruel and unusual punishments" clause of the Eighth Amendment applies to the conditions of a prisoner's confinement. *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). To establish a violation of the Eighth Amendment, a prisoner must first show that a condition is an objectively "cruel and unusual deprivation," and second, that the officials responsible for the condition had the subjective intent to punish. *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000).

As for the first element, the challenged condition must be extreme and "pose an unreasonable risk of serious damage to [a prisoner's] future health" or safety. *Helling v. McKinney*, 509 U.S. 25, 35 (1993). The Eighth Amendment thus guarantees that prisoners will not be "deprive[d] . . . of the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. Yet if prison conditions are merely "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

"The challenged condition must be extreme": the prisoner must show, at the very least, "that a condition of his confinement poses an unreasonable risk of serious damage to his future health or safety." *Chandler v. Crosby*, 379 F.3d 1278, 1289

(11th Cir. 2004) (internal quotation marks and citation omitted).  As part of the court's analysis, the court must determine "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Id.*  (emphasis in original). In evaluating an Eighth Amendment claim, the court considers both the severity and the duration of the prisoner's exposure to the conditions.  *Id.* at 1295.  "[A] prisoner's mere discomfort, without more, does not offend the Eighth Amendment."  *Id.* at 1295.

According to FDOC regulations, special management meal meets the recommended dietary allowances established by the Food and Nutrition Board of the National Research Council.  *See* Fla. Admin. Code r. 33-602.223(2)(a).  The special management meal is served and prepared in a sanitary manner and served three times a day at the normal times for feeding inmates in confinement.  *See id.*, r. 33-602.223(2)(c)–(d).  Water and a nutrient drink are served with the special management meal.  *See id.*, r. 33-602.223(2)(e).  An inmate may be placed on special management meal for creating a security problem by engaging in several acts, including, the throwing or misuse of food utensils or human waste products (for example, storing urine in a cup), or any other act that would place staff in jeopardy if a serving tray or utensils were provided.  *See id.* r. 602.223(3).  An inmate may be

placed on special management meal for a maximum of seven days before being returned to regular meals for a minimum of one day. *See id.*, r. 33-602.223(8).

Here, Adside's factual allegations fail to plausibly suggest that his placement on special management meal for seven days deprived of the "minimal civilized measure of life's necessities" or that the conditions of his confinement posed an unreasonable risk of serious harm to his future health. The only ill effects he alleged he suffered during his seven-day placement on special management meal was difficulty with bowel movements and blood in his stool on one occasion. Adside does not allege he reported any medical problems to prison officials or medical staff. Adside's allegations do not plausibly suggest he faced an unreasonable risk of serious harm to his health as a result of his seven-day placement on special management meal.[8]

Likewise, Adside's allegations regarding his 72-hour placement on property restriction do not plausibly suggest an unconstitutional deprivation. Adside alleges he suffered "some type of pain or discomfort" from having to sit, lie down, and sleep on the thin mat for 72 hours. But mere discomfort for a 72-hour period is legally insufficient to suggest that the property restriction deprived him of the "minimal civilized measure of life's necessities" or that the conditions of his confinement

---

[8] The fact that the DR for possession of contraband (the cup of urine) was eventually overturned does not necessarily mean that the placement on special management meal was unjustified.

posed an unreasonable risk of serious harm to his future health or safety. *See Chandler*, 379 F.3d at 1289 ([A] prisoner's mere discomfort, without more, does not offend the Eighth Amendment.") (citation omitted); *see also, e.g., Turner v. Warden, GDCP*, 650 F. App'x 695, 701–02 (11th Cir. 2016) (prisoner's deprivation of food for 24-hour period and placement on "strip cell" (i.e., full property restriction) for ten days did not rise to the level of cruel and unusual deprivations); *O'Connor v. Kelley*, 644 F. App'x 928, 932 (11th Cir. 2016) (prison officials' decision to place prisoner on strip-cell status did not violate prisoner's Eighth Amendment right against cruel and unusual punishment, even if prisoner felt uncomfortably cold while on strip-cell status, where prisoner alleged no details about actual temperature of his cell or about degree of cold he experienced, and prisoner did not report any medical problems to prison officials); *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008) (no Eighth Amendment violation based on prison officials' decision to deprive prisoner of five meals per week); *Smith v. Wester*, No. 5:18cv192/TKW/HTC, 2020 WL 1678960, at *10 (N.D. Fla. Mar. 12, 2020), *Report and Recommendation Adopted by* 2020 WL 1678078, at *1 (N.D. Fla. Apr. 6, 2020) (requiring prisoner to eat special management meals for seven days did not rise to the level of an extreme deprivation posing a serious risk to plaintiff's future health). *Cf. Chandler v. Baird*, 926 F.2d 1057, 1059 (11th Cir. 1991) (prisoner was entitled to have trier of fact determine whether conditions of administrative confinement,

principally with regard to the cell temperature and the provision of hygiene items, violated the minimal standards required by Eighth Amendment, where prisoner was confined on "strip cell" for *sixteen days* in cold cell with no clothes except undershorts and with only a plastic-covered mattress without bedding; there was filth on cell's floor and walls; prisoner was deprived of toilet paper for three days and running water for two days; prisoner lacked soap, toothbrush, toothpaste, and linens; and cell was earlier occupied by inmate afflicted with HIV virus).

Adside's factual allegations concerning the deprivation of one dinner meal, placement on special management meal for seven days, and placement on property restriction for 72 hours fail to state a plausible conditions of confinement claim under the Eighth Amendment. Therefore, this claim must be dismissed, pursuant to §§ 1915(e)(2)(B)(ii), 1915A(b)(1).

## C.    Adside's First Amendment Claims

Adside claims that his placement on special management meal for seven days and property restriction for 72 hours violated his First Amendment rights to freely exercise his religion.

"In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Lawson v. Singletary*, 85 F.3d 502, 509 (11th Cir. 1996).

However, a prisoner's right to exercise his religion is not absolute; it is only required that he be accorded a reasonable opportunity to pursue his religion. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). Thus, while prisoners maintain a constitutional right to freely exercise their sincerely held religious beliefs, this right is subject to prison authorities' interests in maintaining safety and order. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 (1987); *Turner v. Safley*, 482 U.S. 78 (1987). The Supreme Court held in *Turner* that when a prison regulation or policy impinges upon a prisoner's constitutional rights, the policy is valid if it is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89–91; *Pope v. Hightower*, 101 F.3d 1382, 1384 (11th Cir. 1996). Prison administrators should be given great deference in adopting and executing policies and practices. Absent substantial evidence in the record indicating that officials exaggerated their response to considerations of order, discipline, and security, courts ordinarily should defer to their judgment. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *see also McCorkle v. Johnson*, 881 F.2d 993 (11th Cir. 1989).

In a First Amendment free exercise challenge, prior to considering the reasonableness of a regulation, as set forth in *Turner*, the court must first determine whether an infringement has occurred, specifically, whether the inmate has been substantially burdened in practicing his religion. *See Employment Div., Dept. of Human Res. of Ore. v. Smith*, 494 U.S. 872, 878–82 (1990); *see also Lyng v. NW*

*Ind. Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) ("[I]ndirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment.") (citations omitted); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987); *Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995).

A "substantial burden" is one that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981). Thus, to find a free exercise violation in the prison context, a prisoner must demonstrate that prison officials engaged in conduct not reasonably related to any legitimate penological interest or security measure, which substantially burdened a practice of his religion or prevented him from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and significantly interfere with the prisoner's practice of his religious beliefs. *Cf. Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989) (noting that *O'Lone* found prison regulations valid in part because the prisoners were permitted to participate in other Muslim religious ceremonies).

Adside's free exercise challenge to his placement on special management meal is without merit, because FDOC regulations require the special management meal to *meet the religious needs of inmates on special religious diets*. *See* Fla.

Admin. Code r. 33-602.223(2)(b) (emphasis added). His free exercise challenge to the 72-hour deprivation of use of his prayer rug fares no better. As previously noted, destruction of state property is a violation of the FDOC's Rules of Prohibited Conduct. *See* Fla. Admin. Code r. 33-601.314, § 7-1. FDOC regulations permit restriction of a prisoner's property for 72 hours to prevent, among other things, destruction of property. *See* Fla. Admin. Code r. 33-602.220(5)(q). After 72 hours, staff must reassess the need for continued restriction, and the prisoner's property must be returned when no further threat of the type leading to the restriction is occurring. *See id.*

Adside alleges that prior to the property restriction, Lieutenant Stokes accused him of destroying state property by making a cap out of a state-issued shirt. Adside asserts that the accusation was "unsubstantiated" and that Lieutenant Stokes never actually charged him with a disciplinary infraction. But even if Stokes' suspicion that Adside had destroyed state-issued clothing turned out to be wrong, his placing Adside on 72-hour property restriction and depriving him of all of his property, including his prayer rug, was reasonably related to a legitimate penological interest.

Adside's factual allegations fail to state a plausible First Amendment violation. Therefore, his First Amendment claims must be dismissed, pursuant to §§ 1915(e)(2)(B)(ii), 1915A(b)(1).

**D.    Adside's Fourth Amendment Claim**

Adside also asserts a Fourth Amendment claim, based upon Lieutenant Stokes' placing him on 72-hour property restriction.  By virtue of their incarceration, prisoners have some reduced constitutional rights and the loss of many privileges and rights.  *See Sandin v. Conner*, 515 U.S. 472, 485 (1995).  Prisoners have no reasonable expectations of privacy in their prison cells and thus no Fourth Amendment protection against unreasonable searches of their cells.  *See Hudson v. Palmer*, 468 U.S. 517, 526 (1984); *see also Davis v. Crew*, No. 4:13cv504/MW/CAS, 2014 WL 961201, at *8 (N.D. Fla. Mar. 11, 2014) (dismissing prisoner plaintiff's Fourth Amendment claim based upon defendant's placing him on 72-hour property restriction); *O'Connor v. Carnahan*, No. 3:09cv224/WS/EMT, 2012 WL 2201522, at *8 (N.D. Fla. Mar. 27, 2012) (holding that "*Hudson* precludes Fourth Amendment challenges to prison cell searches and seizures taken for any reason, whether reasonable or not"), *Report and Recommendation Adopted by* 2012 WL 2317546, at *1 (N.D. Fla. June 15, 2012).

Moreover, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post[-]deprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533; *Parratt v. Taylor*, 451 U.S. 527, 541 (1981).  Florida's civil theft statute provides a remedy for a

defendant's knowingly obtaining or endeavoring to obtain the property of another with the intent to either temporarily or permanently deprive that person of his right to the property. *See* Fla. Stat. § 772.11(1).

Adside cannot state a plausible constitutional claim against Lieutenant Stokes for depriving him of his personal property for 72 hours. Therefore, Adside's Fourth Amendment claim must be dismissed, pursuant to §§ 1915(e)(2)(B)(ii), 1915A(b)(1). *See, e.g., Allen v. Sec'y, Fla. Dep't of Corr.*, 578 F. App'x 836, 838 n.3 (11th Cir. 2014) (rejecting prisoner plaintiff's claim that defendant officers seized his personal property in violation of the Fourth and Fourteenth Amendments).

V.    CONCLUSION

Adside's factual allegations fail to state a plausible claim upon which relief may be granted, and there is no indication that providing Adside another opportunity to amend his complaint would produce a pleading which states a plausible constitutional claim. Therefore, the undersigned recommends that Adside's claims be dismissed, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1).

Accordingly, it is respectfully **RECOMMENDED**:

1.    That Plaintiff's claims be **DISMISSED with prejudice** for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1);

2.      That the clerk of court be directed to enter judgment accordingly and close this case.

At Pensacola, Florida, this 27<u>th</u> day of April 2021.


                    */s/ Elizabeth M. Timothy*
                    **ELIZABETH M. TIMOTHY**
                    **CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**